**WARNOCK, MACKINLAY & CARMAN, PLLC**
7135 E. Camelback Road, Suite F240
Scottsdale, Arizona 85251
Tel:   (602) 381-6669
Fax:   (602) 381-6560
Email:   jwhite@lawwmc.com
Brian R. Warnock (Bar No. 012400)
John T. White (Bar No. 022091)
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| SHAY PENDLETON, a surviving parent of JERED PENDLETON, deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF GOODYEAR, an Arizona Body Politic; BRAD HARDIN and JANE DOE HARDIN, husband and wife; JOHN and JANE DOES I-10,<br><br>Defendants. | No. CV 09-2213-PHX-JWS<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)**<br><br>(Assigned to the Honorable John W. Sedwick) |

Plaintiff, Shay Pendleton, hereby files her Response in Opposition to Defendants' Motion for Summary Judgment and, for the reasons set forth herein, respectfully requests that the Court deny the Motion in its entirety.

The fundamental question before this Court on Summary Judgment is whether, as the moving party, Defendants have shown (a) that there are no genuine disputes of material fact and (b) that they are entitled to judgment as a matter of law on all claims. Indeed, they have not met their burden. As discussed herein, Defendants' Motion should be denied in its entirety because there are genuine issues of material fact that will lead a reasonable juror to conclude, as many witnesses in the record have, that Defendant Officer Hardin struck and killed Jered Pendleton and, then, Defendants

covered up and concealed the true nature of his involvement from Plaintiff.  Where, as here, the evidence (particularly when construed in a light most favorable to Plaintiff) would lead reasonable persons to "disagree as to whether particular conduct constitutes negligence, gross negligence, or recklessness, the question is one of fact to be decided by the jury."  *Redman v. City of San Diego*, 942 F.2d 1435, 1145, n.13 (9th Cir. 1991).  Thus, summary judgment should be denied and the matter set for trial.   This Response is supported by the attached Memorandum of Points and Authorities, Plaintiff's Controverting and Supplemental Statement of Facts ("CSSOF") and the exhibits thereto (filed concurrently herewith), and the pleadings and documents on file with the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    BACKGROUND**

    **A.  <u>Introduction</u>.**

    This matter concerns the wrongful death of a young boy, Jered Pendleton, who was struck and killed by a vehicle in the early morning hours of April 6, 2008, the day after his eighteenth birthday.   Troy Castillo, a Sergeant with the Goodyear Police Department ("PD") discovered his body at approximately 4:33 a.m., lying in the middle of Yuma road.  [CSSOF ¶¶ 1, 79.]  It was still dark outside and Officer Castillo could see no other evidence of cars on the road at the time.  [*Id.* at ¶ 80.]  Sgt. Castillo did not immediately check on Jered's condition; instead, he immediately advised dispatch of the need for emergency assistance using his police radio.   [*Id.*]   Almost immediately thereafter, Sgt. Castillo received a call from one of his subordinates:  Defendant Officer Brad Hardin, who reported the following:  ***"Hey, Sarge, 'I was driving down that road and' – he think – he – he goes, 'I think I may have hit that kid.'"***  [*Id.* at ¶ 81.]

    As it turns out, Officer Hardin had, moments before Castillo's discovery, passed through the very stretch of road and hit something with his car, having felt what he

2

described as a "pa-pump." [*Id.* at ¶ 82.][1]  Hardin would eventually tell at least two others that he believed he may have been involved in hitting Jered. [*Id.* at ¶ 83.]

Despite those any many other facts (as set forth below), Plaintiff and the entire Pendleton family were never told about the extent of Officer Hardin's involvement during the investigation. [*Id.* at ¶ 84.]  And, notably, none of Hardin's candid admissions or conversations with other officers that morning was ever documented or reported pursuant to PD policy during the City's investigation, facts admitted by the City's own investigator, Paul Charlton, and many other PD officials. [*Id.* at ¶ 85.] Rather than preserve evidence and investigation Officer Hardin's involvement, the City did the opposite, allowing Officer Hardin to leave the scene and take his vehicle with him, then failing to preserve the record or evidence for later investigation. [*See infra.*]

Instead, in March of this year – almost exactly three years later – the City's own investigator concluded (after a comprehensive internal administrative investigation) that "***the large number of anomalies associated with the Pendleton investigation lends credence to the allegation that members of the Goodyear Police Department worked together to protect one of their own***." [*Id.* at ¶ 87.]  And, to this day, the undisputed evidence has identified only one driver to have passed through that stretch of road moments before Castillo, only one driver to have made contact with Jered in any form that night (*see infra*), only one driver who admitted striking something with his vehicle at that very moment:  Defendant Officer Brad Hardin. [*Id.* at ¶ 88.]  It is not surprising, then, that there have been many deponents in this case who have acknowledged that the reasonable inference can be drawn from the evidence that Hardin struck and killed Jered Pendleton. [*Id.* at ¶ 89.]  Those admissions include the Assistant to the Chief of Police and current City employee, John Rowan, the former victim's advocate assigned to the

---

[1] Hardin claims not to have stopped to check on what it was that he hit and, to this day, does not know what he struck with his vehicle that morning.

case, Terri Woodmansee. [*Id.*]  As a result, Defendants' Motion should be denied and the jury left to determine whether the evidence amounts to negligence, gross negligence, or recklessness in violation of the Constitution. *See Redman*, 942 F.2d at 1145, n.13.

**B.  Facts.**

**1.  Hardin Struck and Killed Jered.**

On April 5, 2008, Jered celebrated his 18th birthday.  He was a senior at Westview High School, a young man with many dreams, many friends, and a very bright future. [*Id.* at ¶ 90.]  To celebrate his birthday, Jered and his friends attended a teenage party in a rural area of Goodyear. [*Id.*]  The party extended into the early morning hours of April 6 and eventually got out hand. [*Id.* at ¶ 91.]  Neighbors called the police after hearing what they believe had been shots fired. [*Id.*]  The City of Goodyear Police (the "City") responded by sending several officers, including Defendant Brad Hardin. [*Id.*]  As the teens at the party heard the sound of the approaching police sirens, many of them scattered, running into the still dark streets. Jered was among them. [*Id.*]  Hardin testified that he took up a position in the front of the residence where the party was, then eventually left once other officers arrived to secure the scene. [*Id.* at ¶ 92.]  Hardin began traveling westbound on Yuma round, en route to the police station. [*Id.*]  He does not recall how fast he was traveling or whether his headlights (low or high) were on at the time. [*Id.* at ¶ 93.]  According to his testimony, as he was traveling he took his eyes off of the road and leaned over at one point to enter information onto his computer system. [*Id.* at ¶ 94.]  He felt a "pa-pump" but did not stop to see what his vehicle had struck. [*Id.*]  Within a minute or two, he heard Sgt. Castillo's radio call, reporting the dead body and immediately had concerns. [*Id.* at ¶ 95.]  Sgt. Castillo had come from a different location than Hardin, having no idea how far Hardin was in front of him or that he was in front of him at all (his dash

cam would later show Hardin's taillights).  [*Id.* at ¶ 96.]  Hardin immediately stopped his vehicle and blocked off the next intersection.  [*Id.* at ¶ 97.]  Then, after waiting for the radio traffic to die down, he used his cell phone to call Sgt. Castillo on his cell phone.  [*Id.*]  He told Castillo he thought he had hit the "kid."  Castillo did not believe that Hardin could have simply missed Jered's body in the middle of the roadway.[2]  [*Id.*]

Castillo called dispatch and requested the accident investigation team to the scene.  [*Id.*]  Sgt. Castillo then used his cell phone to call the head of the accident team, Sgt. Miller, to explain what Hardin had reported.  [*Id.* at ¶ 98.]  Miller then proceeded to drive directly to where Hardin had stopped his vehicle.  [*Id.* at ¶ 99.]  Miller said Hardin was visibly upset and told Miller that he thought he had struck Jered.  [*Id.* at ¶ 100.]  After trying to calm him, Miller claimed to have done a very brief inspection of the vehicle.  [*Id.*]  Notably, though, Miller did not document his interview of Hardin or his inspection of the vehicle.  [*Id.* at ¶ 101.]  He took no photographs and did not inspect the tires or undercarriage of the vehicle.  [*Id.*]  Instead, he told Hardin to take his vehicle home after the scene was cleared.  [*Id.* at ¶ 102.]

Sgt. Miller then drove to the scene of Jered's accident.  [*Id.* at ¶ 103.]  He did not tell a soul about what Hardin or Castillo had told him at that point.  [*Id.*]  Nor did he report to anyone on his investigation team during the initial meeting what he had learned about Hardin.  [*Id.*]  Instead, he assigned a brand-new and inexperienced officer as the case agent (Officer Beck) and assigned Officer Jeff Rogers as the accident reconstructionist, then simply sent them on their way.  [*Id.* at ¶ 104.]  The team investigated the scene for potential leads, but was not able to obtain any firm investigative leads or suspects.  [*Id.* at ¶ 105.]  The scene was cleared within a few hours and the officers were released home.  [*Id.*]  That included Hardin, who could not recall

---

[2] Indeed, the dash camera video from Castillo's vehicle shows the approach under the same conditions that evening.

where he went when his shift ended or why he did not return the following day (or the day after) for his scheduled duty.  [*Id.*]  No officer would author a report about Hardin's involvement up to that point, even though Miller and his team would return later in the evening of April 6, 2008, to continue with the investigation.  [*Id.* at ¶ 106.]

Several days later, Officers Rogers and Beck went to meet with the County Medical Examiner.  [*Id.* at ¶ 107.]  They learned there, for the first time, that Jered had been struck while in the prone position.  [*Id*.]  Rogers and Beck immediately went to speak to then acting Chief of Police, Ralph McLaughlin, who referenced that he already knew about Hardin's involvement.  [*Id.* at ¶ 108.]  They were shocked to learn of Hardin's involvement.  [*Id.*]  Immediately, a team of officers and command staff met to discuss strategy for investigating Hardin and seizing his vehicle, now days after the incident and after the car had been  driven away from the scene.  [*Id.* at ¶ 109.]  All agreed to send a team to Hardin's house to seize the vehicle.  [*Id.* at ¶ 110.]  Despite Rogers expressing some reservations about whether he was competent to conduct the investigation and whether or not it would be better to turn the case over to an outside agency, the acting Chief told him to proceed.  [*Id.*]

## 2.  Evidence of Hardin's Involvement Was Not Adequately Preserved.

Although the seizure was supposed to be a surprise on Officer Hardin, a Detective from the PD called him ahead of time to warn him.  [*Id.* at ¶ 111.]  By this time, he had already been allowed to take his car home with him and there were rumors he had been told to wash it.  [*Id.* at ¶ 112.]  He had also failed to appear to his next scheduled shift without any explanation.  [*Id.*]  And there had been no documentation, photographs, or even mention of the initial conversations among Hardin, Castillo, and Miller on April 6, 2008 or the "inspection" of Hardin's car.  [*Id.* at ¶ 113.]

6

When the PD team eventually arrived at Hardin's home to seize the vehicle, a quick inspection in the daylight discovered a shoe print on the rear left tire of Hardin's car and blood specks on the undercarriage of the vehicle. [*Id.* at ¶ 114.] The shoe print would later fail to be logged properly into and the blood specks were never photographed, among other problems. [*Id.* at ¶ 115.] Other reddish marks were photographed on the front left tire, but never further analyzed. [*Id.* at ¶ 116.] Unlike Sgt. Castillo, Officer Hardin did not activate his dash camera to record his actions at the time he felt the "pa-pump," although he could have done so immediately to preserve the recorded information. [*Id.* at ¶ 117.] By the time Hardin's vehicle was taken into custody, his ignition had been re-started several times, which the City witnesses claim eliminated any chance of obtaining any information from it. [*Id.* at ¶ 118.]

Although Hardin's vehicle was seized, he was never formally interviewed by any member of the PD in connection with the investigation. [*Id.* at ¶ 119.] He would later author a Supplemental Report, summarizing that he believed he may have hit a "shoe," although he admits that he does not know what he hit. [*Id.* at ¶ 120.] Tellingly, neither Castillo, nor Miller, nor Hardin ever issued a report discussing the full extent of Hardin's reported involvement. [*Id.*] That included evidence of "cleaning" marks on the undercarriage that were consistent with the undercarriage of Hardin's vehicle coming into contact with an object. [*Id.* at ¶ 121.] Once again, though PD admits seeing them, they were never photographed or preserved for the record. [*Id.* at ¶ 122.] According to PD officers, Hardin's vehicle was eventually placed back into service, with new tires and other modifications by the time of this case, including a complete undercarriage replacement due to a subsequent major accident. [*Id.* at ¶ 123.]

### 3.  Cover Up Conceived And Revealed.

The City's internal investigator, Paul Charlton, concluded three years after the incident that the evidence in the case "lends credence" to allegations that members of the PD acted to protect the interests of one of their own. [*Id.* at ¶ 124.] The Charlton Report cites many failures by officers within the PD, as well as an overall lack of decision making and control by command staff, coupled with a failure to discipline and, thus, ratifying the failures. [*Id.*] Indeed, these conclusions sparked a series of follow up investigations, including one by Department of Public Safety ("DPS") into potential criminal charges for obstruction of justice and hindering an investigation, an investigation that was cut short before its conclusion according to the lead Detective. [*Id.* at ¶ 125.] The evidence in this case, in fact, also supports the conclusion that Defendants conspired to conceal evidence of Hardin's involvement from Plaintiff.

Soon after Jered's body was found in the road, PD Command Staff was notified and provided with information. [*Id.* at ¶ 126.] That included the acting Chief at the time, Ralph McLaughlin, as well as the Chief, Mark Brown, who was still in the process of transitioning out of a term as interim Deputy City Manager. [*Id.* at ¶ 127.] Mr. Rowan, the assistant to the Chief, raised concerns early on about the investigation's handling and took those directly to Chief Brown. [*Id.* at ¶ 128.] And command staff clearly knew of Officer Hardin's involvement early on: Acting Chief McLaughlin revealed Hardin's involvement to Rogers and Beck days later. [*Id.* at ¶ 129.]

Hardin did not initially author a report about his involvement in the days following April 6; instead, he disappeared, returning to work on April 9. He wrote a report then, but it was silent as to his previous admissions on April 6, his discussions with Castillo and Miller, or the inspection of his vehicle. [*Id.* at ¶ 130.] Castillo and Miller never shared what they knew with the rest of the investigative team, instead keeping from Rogers, Beck, and the other investigating officers the news of Hardin's

8

involvement during the critical hours of initial crime scene investigation.  [*Id.* at ¶ 131.]
Once knowledge of Hardin's involvement reached the investigative team members, PD
officials held frequent, regular meetings to discuss how to handle the investigation and
the disclosure of information, in particular, to Plaintiff and her family.  [*Id.* at ¶ 132.]

Despite what PD witnesses now claim was "public knowledge" within the
department about Hardin's involvement, no report or supplemental report – even to this
day – has documented Hardin's comments to Castillo, Miller, and the dispatch officer
on April 6, 2008, nor any of Sgt. Miller's alleged "inspection" of Hardin's vehicle or his
conversation with Hardin that evening.  [*Id.* at ¶ 133.]  The information concerning Brad
Hardin was never shared with Plaintiff or other members of the family at any time.  [*Id.*
at ¶ 134.]  To the contrary, PD officials even stopped the City's victim advocate, Terri
Woodmansee, from having any further contact with the family.  [*Id.*]

Even after the lawsuit was filed, the City continued to conceal evidence
concerning Hardin's involvement.  Despite that the City retained Paul Charlton in
January of this year to conduct an internal investigation into the Pendleton case, the City
did not disclose it to Plaintiff.  [*Id.* at ¶ 135.]  Instead, Defendants waited until the
investigation was made public through the press to disclose its existence.   Officer
Rogers also produced a timeline at his deposition that had never before been disclosed
in the case and which Plaintiff and her family had never seen before.  [*Id.* at ¶ 136.]

Tellingly, despite all the failures to preserve evidence and complete reports on
Hardin's involvement, PD command staff did not discipline anyone in connection with
the investigation.  [*Id.* at ¶ 137.] As the City's investigator concluded, the failure to take
any effort to correct mistakes or discipline officers is evidence that the City ratified the
conduct and actions of its officers.  [*Id.* at ¶ 138.]  Plaintiff's police expert agrees.  [*Id.*]

Acting Chief McLaughlin candidly admitted in response to a question about whether the PD treated Officer Hardin because he was a member of the PD and one of their own:

> You know, a few months ago, I just believed that in my heart of hearts there would be no conspiracy or cover-up.  There would be nothing – nothing wrong with our investigation **. . . . *Do I believe it's possible that a sergeant covered for an officer?  A few months ago I would have said no.  But now I don't know*. . . .**  And the fact that nothing's in any report about Hardin's involvement disturbs me.  ***And I thought it was an oversight, but maybe it was intentional.***   [*Id.* at ¶ 139.]

### 4.  Defendants Should Be Held Accountable By a Jury.

Years later, MCSO Detective Wright and others recognize that all the evidence collected in the last few years points to Officer Hardin.  [*Id.* at ¶ 140.][3]  Defense expert Tim Leggett has narrowed the timeframe on Jered's death to a few minute window just before his body was discovered by Sgt. Castillo.  [*Id.* at ¶ 141.]  The evidence only suggests one car was in the area at that time, on that stretch of road:  Officer Hardin's.  Indeed, his car had a shoe print on the left rear tire that defense expert Leggett matched to Jered and a reddish mark on the front left tire that seems to match the description of the reddish dirt noted by defense expert Leggett.  [*Id.* at ¶ 142.]  Officer Hardin claims to have simply been not paying attention when he felt the "pa-pump" not knowing what he hit and, he claims, not stopping to check.  [*Id.* at ¶ 143.]  Yet, as Plaintiff's expert, notes, Hardin told Sgt. Castillo immediately that he thought he hit a "kid," despite that Castillo's call had only reported a "body" in the middle of the road.  [*Id.*]

Plaintiff's expert reconstructionist, Ed Maciag, opined that the evidence supports that Hardin may have struck Jered from  a westbound direction, which would have required Hardin to turn his vehicle around from his general eastbound travel.  [*Id.* at ¶

---

[3] Detective Wright would, ultimately, reach the opinion that Hardin's vehicle could be excluded based on a bolt analysis that he admitted was novel, with which he had no personal knowledge or experience, was based only on his own observations, and which was based on an investigative technique that had never-before been used.

144.]   While Hardin certainly did not admit to this, there was sufficient time for him to do so (Hardin's exact whereabouts are only known at the time that Castillo reported the body in the road).  Given that Hardin had just come from a party where people had fled upon police arrival, it is plausible to think that Jered – who had just before his death called a friend for a ride – initially stepped out to the road when he saw lights coming, then slipped and fell with his muddy shoes when he saw it was a police car instead.  [*Id.* at ¶ 145.]   If Hardin was still looking for suspects from the party, he had plenty of time to turn his vehicle around and pursue someone he saw on the opposite side of the road, as Defendants' expert admits that such a move would have only taken seconds to complete.  [*Id.* at ¶ 146.]  As reckless as that may seem, it was certainly not unheard of for Officer Hardin.  He had the nickname "crash" within the PD and had been terminated by a prior department for a history of driving accidents and necessitated a special arrangement with the PD.  [*Id.* at ¶ 147.]

Whether simply negligent by his own admission or reckless based on the evidence, there is more than sufficient evidence to support both the inference that Hardin struck and killed Jered and that the City worked to conceal evidence of his involvement from Plaintiff and the family thereafter.  As Plaintiff's police practices expert, has opined, Hardin likely struck and killed Jered and, thereafter, the investigation by the PD was so "fundamentally flawed as to preclude an objective finding of fact" and an administrative failure by command staff that ratified the conduct by failing to hold officers accountable for their actions.  [*Id.* at ¶ 148.]  It is now time for a jury to do that which the PD never did:  To hold Defendants liable at trial for the violations of 42 U.S.C. § 1983 and Arizona law at trial.

1

2    **II.    ARGUMENT**

3          On a Motion for Summary Judgment, the question before the Court is whether,

4    as the moving party, Defendants have met their burden of providing that there are no

5    genuine disputes of material fact left for trial and that they are entitled to judgment as a

6    matter of law.  *T.W. Elec. Services, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d

7    626, 630-32 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  All

8    "facts must be viewed in the light most favorable to the nonmoving party."  *Scott v.*

9    *Harris,* 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a

10   rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

11   *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)

12   (internal quotation marks omitted).  Here, Defendants have not met such high burdens.

13   Fact issues abound in the record with respect to each of Plaintiff's claims, such that they

     should now be submitted to the jury at trial.

14         A.  **Plaintiff's Notice of Claim Was Timely Filed After She Discovered the**
               **Truth About the City's Involvement.**
15

16         Defendants argue that Plaintiff's state law claims are time barred because she did

17   not serve her Notice of Claim upon them within 180 days of the date Jered died. But

18   Arizona law did not require that.  The deadline to file a Notice of Claim in a wrongful

19   death case, like this one, does not run from the date of the decedent's death, but from

20   the date "the cause of action accrues."  A.R.S. § 12-821.01(a).  The same is true of

21   Arizona's one year statute of limitations to bring suit against a public entity, which runs

22   from the date the action accrues.  *See* A.R.S. § 12-821.  An action "accrues" within the

23   meaning of these statutes not when the underlying event occurs (as Defendants claim in

24   their Motion), but when a person knows or reasonably should know of the "cause,

25   source, act, event, instrumentality or condition which caused or contributed to the

26   damage." A.R.S. § 12-821.01(b).  That is, a claimant, like Plaintiff, has 180 days from

                                                  12

the date she discovers who or what caused her son's death to serve a Notice of Claim and one year from the same date to file her Complaint.  *See Dube v Likins*, 167 P.3d 93 (Ariz. Ct. App. 2007) (reversing dismissal based on discovery rule).

Here, like *Dube*, Plaintiff did not discover—and did not have any reason to know—that the City Defendants had any involvement in Jered's death until May 2009. [CSSOF ¶ 149.]  Prior to that, the City Defendants had gone out of their way to conceal any evidence of potential Police involvement and even affirmatively represented to her that no police officers were involved and that they had no leads at all in the investigation.  Thus, her claims against them did not "accrue" until May 2009, thus rendering her June 2009 Notice of Claim timely.

**B.  Triable Issues of Fact Exist on All of Plaintiff's Claims.**

Although the Complaint alleges a number of claims and theories, the resolution of Defendants' Motion for the Court centers primarily around two factual issues: Whether there is sufficient evidence in the record from which a reasonable juror could conclude (1) that Officer Hardin struck and killed Jered and (2) that the PD attempted to cover up or conceal his involvement from the family.  If there is, then the question of whether those actions constitute negligence, gross negligence, or constitutional deprivations should be given to the jury at trial.  *Redman*, 942 F.2d at 1445, n.13.

**1.  Sufficient Evidence Exists for the Jury to Find That Officer Hardin Struck and Killed Jered Pendleton.**

As explained throughout the Response, there is more than sufficient evidence that supports a reasonable inference that Hardin struck and killed Jered.  He is the only who was in the vicinity at the time of Jered's death; he admitted hitting something with his car at that time; his car had physical evidence connecting him to the scene; and he reported on multiple occasions that he believed he had struck and killed the "kid," even though the initial call on the radio had only noted a dead body in the road.  [*See supra*.]

13

Tellingly, for the last several years, there have been no other suspects.  Evidence connecting Hardin to the scene is powerful, particularly when bolstered by Plaintiff's expert testimony and the concomitant lack of evidence of anyone else's involvement.  In fact, the Court need not look further than the testimony of fact witnesses like Detective Wright, John Rowan, and Terri Woodmansee, who have all reached the reasonable conclusion at one point that Hardin likely struck and killed Jered.  In addition, the inexplicable facts that show Defendants failed to document and preserve so much evidence in this case concerning Hardin and his involvement will allow the jury to draw an adverse spoliation inference at trial,[4] lending further support to the conclusion.

Defendants' Motion relies heavily on the criminal investigations conducted by their own experts and the MCSO, in arguing that Hardin's involvement has been completely ruled out.  But, there are experts on both sides in this case and the jury can determine which are the more credible.  As for the MCSO, its criminal investigation is not binding on these proceedings and Defendants certainly do not suggest the same.  More importantly, however, the MCSO's report relies almost entirely on a bolt-analysis theory that may not even be admissible at trial, based on the fact that it appears to be novel and its proponent utterly unqualified to advance it.  Even then, there is sufficient evidence from which a reasonable juror could disregard its findings, coming more than three years after Jered's death and only *after* the truth about the investigation had gone public, and based on an analysis of the undercarriage of Officer Hardin's car that everyone admits has been completely replaced.  Simply put, there is evidence on both sides that presents a genuine issue for trial, to be resolved by the jury.

Because there are facts from which a reasonable person – like Mr. Rowan, Ms. Woodmansee, or Detective Wright – can conclude that Officer Hardin struck and killed

---

[4] *See, e.g., Glover v. BIC Corp.*, 987 F.2d 1410, 1417 (9th Cir. 1993) (noting that trier of fact may draw adverse inference from the destruction of evidence).

Jered, Plaintiff's claims against him under both state and federal law should be given to the jury. It is well-established that a police officer's conduct during the course of a pursuit can violate the substantive due process rights of those injured by that pursuit, giving right to a claim brought under § 1983 against the officer for death or injury that results. *See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833 (1998).[5] Based on the testimony from Plaintiff's experts, as well as the physical evidence of Hardin's involvement and evidence that he already knew that he had struck a "kid" before Castillo disclosed that, a reasonable juror could conclude that he acted intentionally and/or with reckless indifference when he struck Jered. Likewise, Hardin is also liable for failing to stop and render aid to Jered or even call for help, callously ignoring the serious and obvious medical needs of the one he struck with his police car. An officer's deliberate indifference to the serious medical needs of those who he has in some way detained and/or exercised police power upon is also well-established. *See Estelle v. Gamble,* 829 U.S. 97 (1976); *see Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (affording constitutional protections of *Estelle* to non-incarcerated detainees under the Fourteenth Amendment). The evidence of Hardin's involvement also supports the inference that he deprived Jered's mother of her protected liberty interest in the companionship and society of her beloved son, without due process. *See Kelson v. City of Springfield*, 767 F.2d 651, 653-54 (9th Cir. 1985) (parents possess a constitutionally protected liberty interest in the companionship and society of their children, and a state's interference with that liberty interest without due process of law is remediable under 28 U.S.C. § 1983). Finally, his and others' failures to properly disclose Hardin's involvement and investigate him support a claim that Hardin violated Plaintiff's rights to access to the justice system by covering up the true and complete facts surrounding Jered's death. *See Delew v. Wagner*, 143 F.3d 1219, 1222-23 (9th Cir. 1998).

With respect to Plaintiff's state law claims, by his own admission Hardin claims

---

[5] The Court in *Lewis* explained that the evidence sufficient to support the claim must rise to at least the level of deliberate indifference where there is evidence of deliberation. *Lewis,* 523 U.S. at 850-51.

to have struck something while turning to look at his computer instead of paying attention to the road.  Even Castillo struggled with how, absent negligence or gross negligence, Hardin could have possibly missed Jered in the middle of the road.  At a minimum when viewed with the other evidence, a reasonable juror could conclude that Hardin acted negligently in causing Jered's death.[6]  Accordingly, because there is evidence sufficient for a jury to conclude that Hardin struck and killed Jered on April 6, 2008, there is sufficient evidence to submit Plaintiff's federal and state claims against Hardin to the jury at trial.

> **2.  Sufficient Evidence Exists for the Jury to Determine the City's Liability at Trial.**

Similarly, there are sufficient facts from which a reasonable juror could conclude that the City acted to cover-up or conceal the full extent of Hardin's involvement.  The City's own investigator, Paul Charlton, admitted that the anomalies associated with the investigation lend credence to the conclusion that there was a cover-up.  So does the testimony of the acting Chief, McLaughlin, who said some of the failures were disturbing to him and led him, too, to wonder if there had been an effort to cover-up Hardin's involvement.  The jury will also hear the testimony of Plaintiff and her family, who were never told the truth about Hardin's involvement.  And they will see the fact that, even today, there remain no written reports by the officers detailing critical parts of the investigation.  Such failures, particularly when combined with the lack of documentation of evidence, are overwhelmingly inexplicable.  That is why Plaintiff's police expert has opined that it leads to the conclusion not only that there was a cover-up, but that it was the product of decisions made by teams of PD and City officials, officials who failed to offer any discipline for years until the truth was exposed.

In this Circuit, there are at least three routes to municipal liability under § 1983: (1) direct liability; (2) indirect liability; and (3) inadequate training. *See Gibson v.*

---

[6] The fact that Hardin may have known of his accident with Jered and fled the scene may also give rise to a punitive damages verdict against him at trial under federal law. *See Dang v. Cross,* 422 F.3d 800, 806-07 (9th Cir. 2005).

1   *County of Washoe*, 290 F.3d 1175 (9th Cir. 2002) (recognizing "At least" two routes to

2   entity liability under § 1983); Ninth Circuit Model Jury Instructions (Civil) 9.4 - 9.7

3   (recognizing four theories of recovery under § 1983 against municipalities).

4           As previously pled before the Court in the Motions to Dismiss, Plaintiff has

5   sufficient evidence to submit all three claims to the jury at trial.   Defendants'

6   policymakers and command staff adopted a strategy to conceal or suppress the truth

7   about Hardin's involvement from the family, such that they knew or should have known

8   it would deny Plaintiff's constitutional right to access to the justice system.[7]   And by

9   failing to discipline officers or take any action to correct the underlying failures,

10  Defendants are liable for ratifying practices that led to the deprivation of Plaintiff's

    constitutional rights.   *See Gibson*, 290 F.3d at 1186, 1189 n. 9.

11          In addition, the evidence supports claims against the City for conspiring to

12  deprive individuals of constitutional rights pursuant to meetings, where representatives

13  of the City chose particular courses of action or inaction.   *See, e.g., Franklin v. Fox*, 312

14  F.3d 423, 441 (9th Cir. 2001).   Contrary to the arguments advanced in Defendants'

15  Motion, Arizona law also recognizes claims for conspiracy and aiding and abetting,

16  based on these facts. *See Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement*

    *Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12 (Ariz. 2002).

17

18  **III.    CONCLUSION**

19          For the foregoing reasons and in light of the foregoing authorities, Plaintiff

20  respectfully requests that the Court deny Defendants' Motion in its entirety.

21  //

22  //

---

23  [7] *See Oviatt*, 954 F.2d at 1473-74 (municipality can also be liable if it has a custom of

24  "inaction and such inaction amounts to a failure to protect constitutional rights" or
    where inaction was the result of a custom, a plaintiff must show that the inaction

25  resulted from a "decision [by decisionmakers] to adopt a particular course of action" or
    where "a deliberate choice to follow a course of action [is] made from among various

26  alternatives by the official or officials responsible for establishing final policy with
    respect to the subject matter in question."   *Id.* at 1477 (citations omitted).

RESPECTFULY SUBMITTTED this 6th day of December, 2011.

**WARNOCK, MACKINLAY & CARMAN, PLLC**

By:    s/ John T. White

_____

Brian R. Warnock
John T. White
7135 E. Camelback Road, Suite F240
Scottsdale, Arizona 85251
Attorneys for Plaintiff

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on the 6th day of December, 2011, I caused the foregoing

3

document to be filed electronically with the Clerk of Court through ECF; and that ECF
will send an e-notice of the electronic filing to:

4

The following ECF participants:

5

6

Sally Odegard
Jesse M. Showalter

7

Holloway Odegard Sweeney & Evans, P.C.
3101 N. Central Avenue, Suite 1200

8

Phoenix, Arizona 85012

9

Delivered as a courtesy hard copy to:

10

Judge John W. Sedwick

11

12

By:   s/ Rachel V. Sanders

13

14

15

16

17

18

19

20

21

22

23

24

25

26

19